## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **THALIA R. TOWNSEND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-364** |
| | ) | **Judge Aleta A. Trauger** |
| **REGIONS BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgement (Docket No. 29) filed by

the defendant Regions Bank ("Regions"), to which the plaintiff, Thalia Townsend, has filed a

Response (Docket No. 37), and Regions has filed a Reply (Docket No. 40). For the reasons

discussed herein, the Motion will be granted.

## BACKGROUND & PROCEDURAL HISTORY[1]

Ms. Townsend began working for Regions as a bank teller in 1994. In August of 2010,

she was promoted to the position of Centralized Funding Processor in Regions' Centralized

Funding Department, where she remained for the duration of her employment with Regions. In

this role, Ms. Townsend reported to Regions' Centralized Funding Manager, Danielle Henley,

until Ms. Henley transferred to a different department in July of 2013. During this time, Ms.

Henley reported to Sandy Wilson, who was the Consumer Processing Manager.

---

[1] The undisputed facts in this section are drawn primarily from Ms. Townsend's Response to
Regions' Statement of Undisputed Material Facts (Docket No. 38) and Regions' Response to
Ms. Townsend's Statement of Additional Material Facts (Docket No. 41). Where indicated, this
section also contains admissions from the January 14, 2014 Deposition of Thalia Townsend
(Docket No. 29-1) and references to unchallenged internal Regions' documents attached to the
March 18, 2016 Affidavit of Christopher J. Muro (Docket No. 29-3).

It is undisputed that, in 2012, Ms. Henley gave Ms. Townsend a verbal coaching about her job performance. Ms. Townsend also admits that, during her performance evaluation in early 2013, she received an "overall good" rating but was asked to take communication classes because her "communication skills were not good." (Docket No. 29-1 (January 14, 2014 Deposition of Thalia Townsend ("Townsend Dep.")) 78:23-82:4.) In February of 2013, Ms. Townsend admits, she received another verbal coaching from Ms. Henley regarding a number of errors she had made and the need to manage her time more effectively. (*Id*. at 83:6-87:6.) As a result, Ms. Henley asked Ms. Townsend to complete two tests, one on time management and one on business writing. (*Id*.)

On May 3, 2013, Ms. Townsend received an award for top Centralized Funding producer. On July 5, 2013, however, Ms. Henley gave Ms. Townsend a written warning for continued performance deficiencies, based on specific errors she had made on four different accounts. Ms. Townsend admits that she signed this written warning, that it was accurate, and that she understood its implications. (*Id*.) It is undisputed that, at the time Ms. Townsend received this written warning, the Centralized Funding Department had been downsized from six employees to two and that, while the overall amount of work in the department had decreased to precipitate this downsizing, the two remaining employees – including Ms. Townsend – were required to work long hours to keep up with the work flow. It is also undisputed, however, that Ms. Townsend's error rate remained consistent during the entire time she was employed in the department.

On July 8, 2013, several days after receiving the written warning, Ms. Townsend asked Ms. Wilson if she could transfer to another position within Regions but was told that she was not eligible for transfer, due to having received the written warning. The parties do not dispute that,

pursuant to Regions' internal policy, an employee is not eligible to be hired into an open position within one year of receiving a written warning. It is further undisputed that, at the time she requested a transfer, Ms. Townsend did not express any concerns about her health to Ms. Wilson or Ms. Henley.[2] Ms. Townsend admits that she did not specify any particular position to which she would like to be transferred, nor had she ever, prior to her request for a transfer, asked for any other accommodation in order to perform her job. (*Id*. at 90:8-92:13.)

On the following day, July 9, 2013, Ms. Townsend left work midday to see her physician. Ms. Townsend admits that she saw Dr. Sally Killian, who had already been treating her for high blood pressure for "quite some time" and that, while her blood pressure was very high that day, Dr. Killian did not recommend that Ms. Townsend be hospitalized but, rather, that she simply return for her next scheduled monthly checkup. (*Id*. at 92:14-94:20). With Dr. Killian's written approval, Ms. Townsend then requested leave from Regions under the Family Medical Leave Act ("FMLA"). It is undisputed that Regions granted Ms. Townsend's request and permitted her a full twelve weeks of paid leave, with job protection, under the FMLA.

In September of 2013, while on FMLA leave, Ms. Townsend asserts that she called Regions and spoke with Stephanie Brazelton to ask if she could receive some type of coaching or training to prepare her to return to work. (*Id*. at 102:12-108:4.) Ms. Brazelton informed Ms. Townsend that rehabilitation or training through Regions would not be possible prior to her being released to return to work. (*Id*.) While Ms. Townsend asserts that Regions should have worked with her on job training at that time, she admits that she was not able to return to work

---

[2] Ms. Townsend argues in her briefing that she requested transfer to another department because she had received hurtful remarks about her health (Docket No. 37 p. 3), but there is no evidence in the record to support this assertion or to demonstrate that she complained about any such remarks to Ms. Wilson or Ms. Henley at the time she requested her transfer, nor that she had informed them that she was suffering from any medical conditions.

and that she did not ask her doctor to release her at that time. (*Id*.) Ms. Townsend further admits that Ms. Brazelton informed her that she would be eligible to receive coaching if and when she was released to return to work and was placed in a position. (*Id*. at 113:3-112:11.) Finally, Ms. Townsend admits that, as of the time of this conversation, she did not know when she would return to work. (*Id*.)

It is undisputed that, by letter dated September 29, 2013, Regions notified Ms. Townsend that her last day of FMLA leave would be October 2, 2013 and that her job would not be held after this time. The letter further informed Ms. Townsend that, if she was not ready to return to work as of this date, she would need to request personal leave but that her job would not be held. Specifically, the letter, which was authenticated by Ms. Townsend during her deposition, states: "*While under Personal leave, there is no job protection. . . .* In the event that your position is filled it would be your responsibility to apply for any open position." (*Id*. at 98:11-100:25, p. 48.) Ms. Townsend admits that she received and understood this letter and did not disagree with the end date for her FMLA leave. (*Id*. at 98:11-100:25.) Ms. Townsend also admits that she was aware that her position would not be held and that she would have no guarantee of *any* job protection past the expiration of her FMLA leave. (*Id*.)

On October 29, 2013, nearly one month after Ms. Townsend's FMLA leave had expired, Susan Swanson, a psychiatric Nurse Practitioner who was then treating Ms. Townsend, sent a letter to Regions stating that Ms. Townsend would not be able to return to work through at least December 1, 2013. It is undisputed that Ms. Townsend made no attempt to return to work on December 2, 2013, nor did she provide Regions with a new expected return-to-work date at that time.

Meanwhile, it is undisputed that by letter dated November 18, 2013, Regions notified Ms. Townsend that her position had been filled. The letter informed Ms. Townsend that, if she continued to remain out of work pursuant to a personal leave of absence, she would have thirty days to post for a new position, once being released to return to work. Ms. Townsend admits that she received this letter and understood that her prior position had been filled and that it would be her responsibility to apply for a new position. (Docket No. 29-1 (Townsend Dep.) 101:1-102:11.) Ms. Townsend also admits that, as of November 18, 2013, she had not yet been released to return to work. (*Id*.)

On December 27, 2013, Regions sent Ms. Townsend a letter informing her that, under Regions' policy, employees are allowed a maximum of 180 days of leave within a 12 month period. The letter stated that Ms. Townsend would reach this maximum limit on January 8, 2014 and that, if she remained on leave through January 31, 2014, she would be considered to have resigned from Regions as of February 1, 2014. It further indicated that she would be eligible for rehire after that time only if she were to apply and qualify for an open position. Ms. Townsend admits that she received and understood this letter and that, by allowing her to remain on leave from January 8 through January 31, 2013, Regions effectively allowed her some additional leave time beyond the 180 day maximum, although she did not request it. (*Id*. at 115:6-117:6.) Ms. Townsend also admits that, at the time she received this letter, she did not have an expected return-to-work date. (*Id*.)

On January 21, 2014, Ms. Townsend submitted to Regions a letter from Ms. Swanson stating that Ms. Townsend was released to return to work on January thirty, 2014. Ms. Townsend admits that she understood that, upon this release to return to work, she was required to apply for open positions. (*Id*. at 119:1-8.) Ms. Townsend states, however, that she expected

5

that Regions would reach out to her to let her know what positions were available or to place her

somewhere to "rehab [her] back to work," though she concedes that the communications she

received from Regions indicated only that it would be *her* responsibility to apply for new

positions.  (*Id*. at 121:24-123:10.)

At the time she was released to return to work, in January of 2014, Ms. Townsend admits

that her medical conditions consisted of 1) depression, which was under control and did not

affect her family life, social interactions, or church participation; 2) unexplained heart

palpitations, which she did not indicate had any impact on her daily functioning; and 3) low iron,

which Ms. Townsend asserts made her too tired to drive her son to school, do activities with him,

or be a "100 percent Mom." (*Id*. at 123:17-126:12).  Ms. Townsend does not dispute that the low

iron she suffered did not stop her from fully participating in church and social activities.

In February of 2014, during the thirty days following her release to return to work, Ms.

Townsend applied for four positions at Regions: one Branch Team Leader position, one

Mortgage Loan Originator Position, and two Financial Services Specialist positions at two

different locations.  It is undisputed that the Branch Team Leader position required "excellent

communication" and the "ability to work with money transactions with a high degree of

accuracy."  It is further undisputed that the Mortgage Loan Originator and Financial Services

Specialist positions required registration with the National Mortgage Licensing System

("NMLS").[3]  Descriptions of these positions, attached to the March 18, 2016 Affidavit of

---

[3] Regions does not assert in its Statement of Undisputed Material Facts that the Branch Team Leader position also required NMLS registration (*see* Docket No. 38 ¶¶ 28-32), though the document in the record outlining the qualifications this position shows that it does (Docket No. 29-3 (Ex. D. to Affidavit of Christopher J. Muro) p. 28 (listing NMLS registration as a qualification for the Branch Team Leader position twice, both in the internal and external descriptions for the position)), and there is no evidence in the record to suggest that this position did *not* require NMLS registration.

Christopher J. Muro, Vice President, Human Resources Team Leader at Regions (the "Muro Aff."), also show the following: 1) the Financial Services Specialist positions[4] listed qualifications including excellent communication skills, the "ability to work under busy conditions with high attention to detail," and a minimum of one year of sales experience; and 2) the Mortgage Loan Originator position listed qualifications including two years of mortgage lending experience with proven mortgage production, "abundant mortgage experience in developing external business via referral partners in the market including but not limited to realtors, builders, and financial planners," accurate grammar and spelling skills, good written and oral communication skills, and good organization skills. (Docket No. 29-3 (Exs. C, D, and E to Muro Aff.) pp. 18-19, 28, 37-39.)

As recounted above, Ms. Townsend had been required by her former supervisor to take training classes because her communication skills were "not good," and she was given verbal and written warnings by her supervisor for repeated errors involving accuracy in transactions. It is further undisputed that her spelling and grammar skills had "started to decline" at the time she was applying for these positions. Finally, it is undisputed that Ms. Townsend was not registered with NMLS, had no prior mortgage loan origination experience, and had never been licensed to sell mortgages. Ms. Townsend also admits that she had no prior experience as a Mortgage Loan Originator or in the area of mortgage loan origination. (*Id*. at 139:15-21, 142:9-143:4). Ms. Townsend asserts that she was qualified for the Financial Services Specialist position based on prior experience at another company over a decade before she applied, but she also admits that the written warning from July of 2013 was a part of her personnel file and that it demonstrated

---

[4] The record actually only contains a description of one of the two Financial Services Specialist positions that Ms. Townsend applied for at this time, though there is no indication in the record that the qualifications for this position would differ by location.

lack of attention to detail, which was a qualification for this position.  (Docket No. 29-1

(Townsend Dep.) 137:14-139:14.)

A printout of Ms. Townsend's applicant file from Regions' records, also attached to the

Muro Affidavit, indicates that one of the Financial Services Specialist positions and the Branch

Team Leader position were filled within days of Ms. Townsend's applications for these positions

and before Ms. Townsend's applications were reviewed.  (Docket No. 29-3 (Ex. B. to Muro Aff.)

p. 9.)  The same document also indicates that Ms. Townsend was not selected for the other

Financial Services Specialist position she applied for (noting that her skills and background did

not match) and that she was not selected for the Mortgage Loan Originator position (noting that

she had a lack of relevant work experience).  (*Id*. at p. 10.)  Finally, this document lists, both in

the introduction to Regions' online Job Posting Center as well as in the prescreening

disqualifications listed for each job description, that a Regions employee is ineligible for an open

position if they have received a written warning within the past 12 months.  (*Id*.)  There is no

indication in this document, or elsewhere in the record, however, that Ms. Townsend was

prevented from applying for these positions, that her application was not considered, or that she

was not selected based solely on the existence of the written warning in her file as an automatic

disqualifier.

It is undisputed that, on February 26, 2014, Ms. Townsend emailed Regions' Assistant

Vice President of Human Resources, Patti Andrews, and Leave of Absence Coordinator, Jocelyn

Crook, stating "I would like to know why the doctors [sic] accommodation for me has not been

granted.  Also has HR ever granted employees to receive such accommodations similar to mine

what is Regions policy [sic]?"  Ms. Crook responded by asking for clarification as to what

accommodations Ms. Townsend was referencing, and Ms. Townsend replied, "The return to

work accommodation per the doctors request dated 1 28 2014 [sic] for light duties working 4 hours per day for the 1ˢᵗ 3 weeks then 6 hours then gradually move up to 8 hours a day." Ms. Crook then further replied, "Now that you are released to return to work, with the restrictions noted by the doctor, you had thirty days from the date of release, [sic] to post for any available positions as an internal candidate. The accommodation the doctor is asking for can only be evaluated once you are being considered or have a position to return to." Ms. Townsend asserts that, in this email exchange, she was referring to two prior requests for accommodation: 1) her conversations with Ms. Brazelton, in September of 2013, in which she asked for job coaching and was denied; and 2) and a letter from Ms. Swanson to Regions dated January 28, 2014, in which Ms. Swanson requested that, when returning to work, Ms. Townsend be given a temporarily shortened work day that would gradually increase to a full eight-hour day over a period of weeks. (*Id*. at 126:14-133:10.)

Ms. Townsend admits that, at the time this email exchange with Ms. Crook took place in February of 2014, she understood that it was her responsibility to apply for and secure a position at Regions within thirty days of her release to return to work and that open positions were posted to Regions' internal job board. (*Id*.) She asserts, however, that she expected that Regions would place her into a position, possibly even one that was created for her and was not posted on Regions' job board, and that she would be given light office duties such as typing, filing, and answering phones, while receiving coaching to prepare her for another position. (*Id*.) Ms. Townsend admits, though, that she never explicitly requested this type of arrangement and that she was aware of no specific positions into which she could have been placed in this manner. (*Id*.)

Ms. Townsend's employment with Regions was terminated on March 1, 2014.

The record shows that, subsequent to her termination, Ms. Townsend continued to apply for open positions at Regions, including one C&I Banking Assistant position, three Teller positions, four additional Financial Services Specialists positions, three additional Branch Team Leader positions, one Branch Service Leader position, and one Mortgage Sales Associate position, at various locations. (Docket No. 29-3 (Ex. B. to Muro Aff.) pp. 10-14.) It is undisputed that the C&I Banking Assistant, Branch Service Leader, and teller positions did not require any specialized licenses. According to written descriptions of these positions, attached to the Muro Affidavit, qualifications for the C&I Banking position include strong organizational skills and excellent written and verbal skills; qualifications for the Branch Service Leader position include excellent communication skills and the "ability to work with money transactions with a high degree of accuracy;" qualifications for the Mortgage Sales Associate include spelling and grammar skills, written and oral skills, and organizations skills, as well as NMLS registration; and qualifications for the Teller positions include excellent communication skills and the "ability to work with money with a high degree of accuracy."[5]

According to Regions' records of Ms. Townsend's applicant file, the following details were listed next to the notations that she was not selected for each of these positions: the C&I Banking position was filled with an internal candidate (Ms. Townsend had already been terminated from Regions at the time she applied); one of the Financial Services Specialist positions was filled within days of Ms. Townsend's application being filed and before her

_____

[5] The record actually only contains a description for one of the Teller positions Ms. Townsend applied for at this time. The descriptions for the other teller positions were not provided, nor were the descriptions of the positions that Ms. Townsend applied for at this time that were the same as positions for which she previously applied (namely the financial Services Specialist positions and Branch Team Leader positions.) Again, however, there is no indication in the record that qualifications for any of these positions would have varied from one location to another.

application was reviewed; two other Financial Services Specialist positions were marked that

Ms. Townsend's skills and background did not match; and Ms. Townsend's application for a

final Financial Services Specialist position was marked as forwarded but then indicated that Ms.

Townsend was "ineligible to post;"[6] the Branch Team Leader positions and the Mortgage Sales

Associate position were marked that Ms. Towsend's background and skills did not match.

(Docket No. 29-3 (Ex. B. to Muro Aff.) pp. 10-14.)   Finally, this document indicates that Ms.

Townsend did not complete the requisite online assessments associated with her applications for

the Teller positions and that these applications were marked withdrawn and that she did not

complete required testing for the Branch Service Leader position.  (*Id.*)

Ms. Townsend admits that she did not complete the online assessment for the teller

positions because she was not feeling well, despite receiving emails instructing her that she must

complete the assessments in order to complete the applications and that she could do so at her

convenience.  (Docket No. 29-1 (Townsend Dep.) 150:5-155:2.)  Ms. Townsend further admits

that she never contacted anyone at Regions about her inability to complete the assessments, nor

did she ever ask for an alternative assessment or for any exception to be made for her

applications.  (*Id.*)

Finally, Ms. Towsend admits that she was never contacted by Regions about any of the

positions for which she applied, before or after her termination, that she was not aware of the

reasons she was not selected, and that she never followed up.   There is no evidence in the record

whatsoever about the applicants who were hired to fill any of these positions, with the exception

---

[6] The notation may have referred to the July 2013 written warning in Ms. Townsend's personnel file, but this is not at all clear from the record.  There is also no explanation for why this application was processed differently from the other Financial Services Specialist positions, for which the document indicated she was not selected because her background and skills did not match.

of the notation on Ms. Townsend's applicant file referenced above, indicating that one of the positions Ms. Townsend applied for after she was terminated was filled with an internal candidate.

This action was initiated on March 2, 2015, in the Circuit Court for Davidson County Tennessee. (Docket No. 1-1.) On April 2, 2015, Regions removed the case to federal court. (Docket No. 1.) On June 26, 2015, Ms. Townsend filed the Amended Complaint, which is the current operative pleading. (Docket No. 10.) The Amended Complaint contains causes of action for 1) violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA") and 2) retaliation under the FMLA, 29 U.S.C. § 2601 *et seq*. The Amended Complaint seeks compensatory and punitive damages.

On March 21, 2016, Regions filed a Motion for Summary Judgment, along with a Memorandum in support and a Statement of Undisputed Material Facts. (Docket Nos. 29, thirty, 31.) On April 20, 2016, Ms. Townsend filed a Response in Opposition, along with a Response to Regions' Statement of Undisputed Material Facts, and her own Statement of Additional Material Facts. (Docket Nos. 37, 38, 39.) In her Response, Ms. Townsend expressly concedes her FMLA claim and only opposes summary judgment with respect to her ADA claims. (Docket No. 37 p.1.) On May 4, 2016, Regions filed a Reply and a Response to Ms. Townsend's Statement of Additional Material Facts. (Docket Nos. 40, 41.)

## LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least

one essential element of the plaintiff's claim. Once the moving defendant makes its initial

showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting]

forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*,

578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must

demonstrate that no genuine issue of material fact exists as to all essential elements of her

claims. "In evaluating the evidence, the court must draw all inferences in the light most

favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue

of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*,

578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

Ms. Townsend asserts two separate claims under the ADA: 1) that she was terminated

from Regions due to her disability, constituting discriminatory discharge; and 2) that Regions

failed to provide her with reasonable accommodations for her disability that would have allowed

her to continue her employment. The ADA prohibits an employer from discrimination "against a

qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a). Absent direct evidence, a

plaintiff must demonstrate the following in order to establish a *prima facie* case of employment

discrimination under the ADA: 1) she is disabled; 2) she is otherwise qualified for the position,

with or without accommodation; 3) she suffered an adverse employment decision; 4) the

employer knew or had reason to know of her disability; and 5) the position remained open while

the employer sought other applicants or replaced the plaintiff. *Whitfield v. Tennessee*, 639 F.3d

253, 258-59 (6th Cir. 2011). If a *prima facie* case is established, the court must then apply the

burden-shifting paradigm laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, the burden shifts to the defendant employer to establish a non-

discriminatory reason for the adverse employment action and then, if the defendant is able to do

so, the burden shifts back to the plaintiff to prove that this proffered reason is pretext and the

adverse action was really based on a discriminatory reason. *Id*. at 259.

The court finds that Ms. Townsend cannot establish a *prima facie* case of employment

discrimination under the ADA based on her termination from Regions. Even assuming that Ms.

Townsend could establish that she is disabled,[7] she cannot establish that she was qualified to

retain her employment at Regions at the time she was terminated. The record clearly shows that

Ms. Townsend used up her allotted FMLA leave as well the maximum personal leave allowed

---

[7] "An individual is considered disabled under the ADA if she (1) has a physical or mental impairment that substantially limits one of more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (internal citations omitted). The only evidence in the record that Ms. Townsend was disabled at the time she was terminated is that she had taken FMLA leave, she had a letter from her psychiatric nurse practitioner indicating that she was released to return to work but would need several weeks of temporarily shortened hours, and that she was too tired to drive her son to school or do activities with him. It is not at all clear that these facts could reasonably constitute a *substantial* impairment to Ms. Townsend's major life activities (or be perceived by Regions as such).

under Regions' company policy. Despite Regions' allowing her additional personal leave time through the end of January of 2014 and then allowing her thirty days after her release to return to work to apply for and secure a position, Ms. Townsend failed to secure any open position at Regions, subjecting her to termination pursuant to Regions' unchallenged policy. Moreover, to the extent that the adverse employment decision is characterized as Regions' decision not to hire Ms. Townsend into any of the open positions for which she applied at this time, rather than the ultimate decision to terminate her, Ms. Townsend is still unable to establish a *prima facie* case of discrimination. She has simply not provided any evidence to show that she was qualified for any of these positions. To the contrary, it is clearly established by the record that at least three of the four positions Ms. Townsend applied for during this time required NMLS registration, a qualification which she did not have. It appears from the record that the fourth position may have had this requirement as well but, even if it did not, that position required excellent communication skills and the ability to handle monetary transactions with a high degree of accuracy. Ms. Townsend admits that she had declining grammar skills at the time she applied as well as a written warning in her personnel file indicating that she had made several errors processing transactions in her prior position.

Even if the court were to accept Ms. Townsend's argument that she was qualified to have been placed in some unspecified position within Regions and, therefore, find that she has established a *prima facie* case of discrimination, Regions has clearly shown that Ms. Townsend was terminated because there was no open position for her to fill. Ms. Townsend is unable to establish that this reason is pretext or, indeed, point to any company policy that would support her argument that Regions should have handled her return from leave differently than it did.

Ms. Townsend argues that Regions' only proffered reason for her termination is the existence of Ms. Townsend's written warning from July of 2013, which automatically disqualified her for any position upon returning from leave. Ms. Townsend then argues that this reason for her termination is pretext because she was told that she could have thirty days to apply for positions, a communication that suggested she would not be automatically disqualified, but, after requesting the phase-in schedule accommodation, Regions changed its course. In making this argument, however, Ms. Townsend overlooks several critical points. First, the existence of the written warning in her personnel file is clearly not the only proffered reason for why she was not hired into any of the positions for which she applied. The undisputed evidence shows she was unqualified for each of these positons for other reasons. Second, it is not at all clear from the record that Ms. Townsend's applications *were* disqualified from consideration based on the existence of the written warning in her file and that an exception to the disqualification rule was not made for her applications because she was returning from leave without a position.

Finally, even if her applications had been rejected solely for this reason, the fact that Ms. Townsend was inadvertently led to believe that her applications would not be so disqualified, based on communications about the thirty-day application policy, does not actually support a finding that Regions first intended to make an exception for Ms. Townsend's application and then later did not. It is, at most, indicative of a misunderstanding. Indeed, despite knowing of the written warning in her file, Ms. Townsend has shown no evidence that she ever inquired about the effect of the disqualification policy on her applications during the thirty days following her release.

For the same reasons, Ms. Townsend also cannot establish a claim for failure to accommodate under the ADA. This claim requires a plaintiff to show that she was *qualified* for

16

a position but was denied a reasonable accommodation. *Kleiber v. Honda of America*, 485 F.3d 862, 868 (6th Cir. 2007). As explained above, Ms. Townsend was not qualified for any of the positions to which she applied prior to her termination, nor was she qualified to remain a Regions employee, absent being able to secure a position following the expiration of her allotted leave and her release to return to work. Employers are not required "to create new jobs or displace existing employees from their positions . . . in order to accommodate a disabled individual." *Id*. at 869 (internal citations omitted); *see also Hedrick v. Western Reserve Caare Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) ("an employer need not reassign a disabled employee to a position for which he is not qualified nor is the employer required to waive legitimate, non-discriminatory employment policies or displace other employees' rights in order to accommodate a disabled employee").

Ms. Townsend's argument that Regions should have found some, unspecified position for her is, therefore, untenable. "Where the requested accommodation is a job transfer, employers have a duty to locate suitable positions for employees with disabilities. Nonetheless, to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for the position." *Kleiber*, 485 F.3d at 870. Again, Ms. Townsend is unable to point to any specific open position at Regions for which she was qualified. Finally, Ms. Townsend cites *Kleiber* to argue that Regions was required to engage in an "interactive process" of locating a position for her following her leave. *Id*. at 871-872 (holding that an employer was required to engage in an interactive process to determine whether an employee returning to work after a disabling injury could be placed into any of the employer's open positions and that the employer met this obligation by evaluating whether the employee's disabilities could be accommodated by any of the known vacant positions). It is clear from the

17

record that Ms. Townsend had access to Regions' internal job posting board and was able to

identify all vacant positions.  Moreover, unlike in *Kleiber*, Ms. Townsend's lack of qualifications

for these positions were separate and apart from her alleged disability and, therefore, there was

no need for Regions to consider whether her disability could be accommodated in any particular

position (for example, whether a position could reasonably accommodate her requested phase-in

work schedule or her request for coaching).  For these reasons, the court cannot find that Regions

failed to accommodate Ms. Townsend under the ADA.

Finally, while Ms. Townsend does not expressly argue that her ADA rights were violated

by Regions' failure to hire her into any of the positions for which she applied *subsequent* to her

termination, the court notes that the record squarely forecloses Ms. Townsend's ability to

establish any such claim.  Once again, Ms. Townsend has failed to establish that she was

qualified for any of these positions or even, in some instances, completed the application

process.  To the contrary, the record is replete with undisputed facts to demonstrate that Regions

had a non-discriminatory reason for not selecting Ms. Townsend for these positions.  Ms.

Townsend concedes that she was not registered with the NMLS, that she had a written warning

in her personnel file that showed she had been disciplined for errors involving accuracy and

attention to detail, and that the positions she applied for – with the exception of the teller

positions for which she did not complete the applications – required NMLS certification and/or

accuracy in handing transactions. [8]

---

[8] Even if Ms. Townsend were able to establish a *prima facie* case of discrimination, she has
provided no evidence to show that her lack of qualifications, her failure to complete the
application requirements, and/or the fact of the positions having already been filled by other
applicants were actually pretext and that she was not hired based on discriminatory motive.
There is no evidence in the record about the applicants who were hired for these positions, or
about how other non-disabled applicants with similar deficiencies in their applications have been
treated by Regions.  Even assuming that the one position for which Ms. Townsend was noted

The court is not unsympathetic to Ms. Townsend's hope that, after many years as an employee for Regions and having won awards and earned promotions, Regions would have welcomed her back from her leave by finding – or even creating – some position for her. There is simply no evidence in the record, however, to suggest that Regions had any internal policy of providing this type of arrangement to any employee following leave, or otherwise promised Ms. Townsend this arrangement, let alone that Regions discriminated against Ms. Townsend by failing to provide this benefit to her. To the contrary, the record shows clear communication between Regions and Ms. Townsend, explaining that Regions would follow its policy of placing the onus on Ms. Townsend to fill a vacant position within thirty days of her release to return to work or be terminated. Ms. Townsend may not have received the treatment she wanted, or even necessarily the treatment she deserved, but it is clear from the record that Ms. Townsend cannot establish that Regions violated the ADA in any manner. Accordingly, Ms. Townsend's claims cannot proceed as a matter of law.

## CONCLUSION

For the foregoing reasons, Regions' Motion for Summary Judgment will be granted and Ms. Townsend's claims will be dismissed with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

"ineligible to post" was not given to her because of the existence of the written warning in her file, for the reasons discussed above, this does not establish pretext so as to allow Ms. Townsend's claim to survive summary judgment.